Filed 8/3/18 (unmodified opinion attached)

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | E066674 |
| Plaintiff and Respondent, | (Super.Ct.No. RIF1506598) |
| v. | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** |
| BRIAN KEITH KOBACK | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT

The court has reviewed the petition for rehearing filed July 25, 2018. The petition

is denied. The opinion filed in this matter on July 17, 2018, is modified as follows:

On page 2, in the editorial information, insert Deputy Attorney General Craig

Russell. The paragraph should read as follows:

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of sections III.B and III.C.

1

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Craig Russell, Deputy Attorneys General, for Plaintiff and Respondent.

On page 3, the second sentence of the second full paragraph should read:

A trial court has discretion under the three strikes law to impose concurrent sentences if the current offenses occurred on the same occasion or arose from the same operative facts.

On page 15, change the first full paragraph to read:

"If there is a current conviction for more than one felony count *not committed on the same occasion, and not arising from the same set of operative facts*, the court *shall* sentence the defendant consecutively on each count . . . ." (Pen. Code, §§ 667, subd. (c)(6), 1170.12, subd. (a)(6), italics added.) Under the plain language of the statutes, the trial court has no discretion to sentence a defendant to concurrent sentences under the three strikes law when the current felony convictions were not committed on the same occasion or did not arise from the same operative facts. In that situation, consecutive sentences are mandatory. (*People v. Hojnowski* (2014) 228 Cal.App.4th 794, 800.) But the trial court has discretion to impose concurrent sentences if it concludes the current convictions were committed on the same occasion or did arise from the same operative facts (*People v. Casper* (2004) 33 Cal.4th 38, 42), unless a consecutive sentence is otherwise mandated by another statute (*People v. Torres* (2018) 23 Cal.App.5th 185, 198).

2

On page 16, change the first full paragraph to read:

The People also argue that, if we conclude the trial court misunderstood its discretion, we should not remand for resentencing because there is no possibility the trial court will conclude the offenses were committed on the same occasion or did arise out of the same operative facts. According to the People, the record supports the trial court's implied findings that the current offenses were not committed on the same occasion or did not arise from the same operative facts.

These modifications do not change the judgment.

CERTIFIED FOR PARTIAL PUBLICATION

McKINSTER
Acting P. J.

I concur:

MILLER
        J.

3

Filed 7/17/18 (unmodified version)

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | | |
|---|---|---|
| THE PEOPLE, | | |
|     Plaintiff and Respondent, | | E066674 |
| v. | | (Super.Ct.No. RIF1506598) |
| BRIAN KEITH KOBACK, | | OPINION |
|     Defendant and Appellant. | | |

APPEAL from the Superior Court of Riverside County.  W. Charles Morgan,

Judge.  (Retired Judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant

to art. VI, § 6 of the Cal. Const.)  Affirmed in part; reversed in part.

Jason L. Jones, under appointment by the Court of Appeal, for Defendant and

Appellant.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of section III.B and III.C.

1

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Deputy Attorney General, for Plaintiff and Respondent.

Defendant Brian Keith Koback walked into a rental car company office and stole a set of car keys. When confronted by three employees in the parking lot, defendant told the men to back off or he would "fuck" them up. He then walked across the street. Undeterred, the three employees followed defendant to a motel parking lot where they again confronted defendant and demanded that he return the keys. Defendant made a tight fist around one of the key fobs, so that the ignition portion of the key was sticking out between his knuckles and, from within arm's reach, lunged at one of the employees while swiping or swinging at the employee's torso. Luckily, defendant did not make contact. When the employees backed off, defendant jumped a fence and tried to flee. Police officers arrived and pursued defendant. Officers subdued defendant after a brief struggle, during which three of the officers suffered minor injuries.

Defendant was charged with and convicted of robbery, assault with a deadly weapon, and resisting arrest. Defendant admitted he had suffered a strike conviction, and the trial court sentenced him to state prison for 14 years four months. On appeal, defendant argues: (1) his conviction for assault with a deadly weapon is not supported by substantial evidence because there is no evidence he used the car keys in a manner that was capable of inflicting and likely to cause great bodily injury; (2) the trial court abused its discretion by imposing consecutive sentences on the robbery and resisting arrest counts, under the mistaken belief that it could only impose concurrent sentences if it

2

struck defendant's strike prior; (3) the minutes of sentencing and abstract of judgment do not accurately reflect the oral pronouncement of sentence with respect to restitution and parole revocation fines; and (4) the minutes of sentencing contain a clerical error, in that they reflect that defendant admitted two strike priors instead of one.

In the published portion of this opinion, we conclude defendant's conviction for assault with a deadly weapon is supported by substantial evidence. A car key is not an inherently deadly or dangerous weapon, but if wielded as a makeshift weapon with sufficient force at close range, as defendant did here, a key is capable of puncturing skin and causing serious bodily injury.

In the unpublished portion of this opinion, we conclude the trial court erred when it concluded the only way it could impose concurrent sentences on defendant's robbery and resisting arrest convictions is if it first struck defendant's admitted strike prior. A trial court has discretion under the three strikes law to impose concurrent sentences if the current offenses did not occur on the same occasion and did not arise from the same operative facts. We reverse the sentence and remand for the trial court to resentence defendant and to consider in the first instance whether concurrent sentencing is appropriate in this case. We agree with defendant that the minutes and abstract of judgment do not reflect the oral pronouncement of judgment with respect to the restitution and parole revocation fines, and that the minutes inaccurately state that defendant admitted two strike priors. Because we reverse the sentence, we leave it to the trial court and the Department of Corrections and Rehabilitation to ensure that the

3

minutes and abstract of judgment will accurately reflect whatever sentence the court imposes on remand.

I.

PROCEDURAL BACKGROUND

In an information, the People charged defendant with the following: assault with a deadly weapon other than a firearm, to wit, a key (Pen. Code, § 245, subd. (a)(1), count 1); robbery (Pen. Code, § 211, count 2); and (3) resisting arrest (Pen. Code, § 69, count 3). The People alleged defendant suffered two prior prison terms (Pen. Code, § 667.5, subd. (b)), to wit: a 2013 conviction for possessing a controlled substance (Health & Saf. Code, § 11377, subd. (a)) and a 2011 conviction for attempted carjacking (Pen. Code, §§ 664, 215). Finally, the People alleged defendant's 2011 conviction for attempted carjacking was a serious felony and a serious and violent felony. (Pen. Code, §§ 667, subds. (a), (c), (e)(1), 1170.12, subd. (c)(1).)

A jury found defendant guilty on all three counts. In a bifurcated proceeding, defendant admitted his 2011 conviction for attempted carjacking was a strike. The trial court sentenced defendant to a total term of 14 years four months in state prison.

Defendant timely appealed.

4

II.

FACTS

On November 6, 2015, defendant walked into a rental car company office, grabbed a set of car keys from the front desk, and walked out.[1]  Chase,[2] an employee who was manning the front desk, learned what had happened from a customer and followed defendant into the parking lot.  Chase told defendant to stop, and said, "Please give me the keys."  Defendant kept walking away, pretended not to know anything about the keys, and reached into the pocket of his sweatpants.  Fearing defendant might be armed, Chase backed off and enlisted the help of two other employees who happened to be nearby, Agustin and Arthur.  The three employees formed a wide circle around defendant to prevent him from leaving.

Chase and Agustin noticed that one of the keys was hanging out of defendant's pocket, and they demanded defendant return the keys.  Defendant stopped and stood facing Agustin and Arthur from about two feet away.  Chase backed off and stood about five feet behind defendant.  Defendant appeared to be getting angry.  Defendant again reached into his pocket, "like he was going to go for something."  Defendant told the men

---

[1]  The set consisted of two car keys attached to key "fobs," and a tag from the rental car company, on a wire ring.

[2]  We refer to the three witnesses by their first names only, and we mean no disrespect in doing so.  We point out that the record includes different spellings of the same witnesses, i.e., Agustine/Agustin and Arthur/Arturo.  We will use Agustin and Arthur, respectively.

to "back up" or "move," or he would "fuck" them up.  He then began to walk away across the street.  The employees then got into Arthur's car and followed defendant into a motel parking lot across the street.

The three men stood around defendant in the motel parking lot and again demanded that defendant return the car keys.  Chase testified defendant stood "[a]bout a foot from arm's reach" away from the three men, but that Agustin was closest to defendant.  Agustin testified defendant stood two to three feet away from him, and was within arm's reach.  Defendant asked, "You want the keys?"  He then took the car keys from his pocket, made a tight fist, and held one of the keys with the "sharp" or ignition end of the key sticking out between his knuckles.  Defendant then "charged," "came at," or "lunged" at Agustin and "swung" or "swiped" the key at Agustin's torso.  Arthur described defendant's motion like "throwing a punch."  Agustin testified he was nervous and afraid that he might get hurt because defendant swung the key at him "with force."  Chase testified he did not believe defendant was close enough to Agustin to actually make contact.  But Agustin testified he was not hit "because my nephew [i.e., Arthur] pulled me back."  Arthur testified, "If I didn't move [Agustin], he probably would have got hit."  The three men backed away from defendant.

Defendant then put the keys back into his pocket, took off, and scaled the wall behind the motel.  The employees got back into the car and found defendant as he walked along one of the streets behind the motel.  They followed defendant by car through a small area of shops and streets for about 40 minutes, until law enforcement arrived and

6

took over the chase. Several deputies chased down and subdued defendant. Defendant resisted, and three deputies were injured in the process.

Defendant testified he found the car keys next to a bus stop. Defendant ran from the police because he feared for his life. He denied taking the car keys from the rental car company office, denied resisting arrest, and denied that he swung the keys at Agustin.

III.

DISCUSSION

A.      *Substantial Evidence Supports Defendant's Conviction for Assault with a Deadly Weapon.*

Defendant argues his conviction for assault with a deadly weapon is not supported by substantial evidence because he did not use the car keys—an object that is not inherently deadly or dangerous—in a manner that was capable of causing and likely to result in serious bodily injury. On this record, we conclude defendant did, in fact, use the car keys as a deadly weapon.

Our standard of review is well settled. "We ""'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'"" [Citation.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)

"""'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be

7

convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]"'"'" (*People v. Harris* (2013) 57 Cal.4th 804, 849-850.) "'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict. [Citations.]'" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

"As used in [Penal Code] section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury. [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed established their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue. [Citations.]" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029 (*Aguilar*).)

"'"'When it appears . . . that an instrumentality . . . is capable of being used in a 'dangerous or deadly' manner, and it may be fairly inferred from the evidence that its possessor intended on a particular occasion to use it as a weapon should the

8

circumstances require, . . . its character as a 'dangerous or deadly weapon' may be thus established, at least for the purposes of that occasion." [Citation.]' (*People v. Graham* (1969) 71 Cal.2d 303, 328 . . . , quoting *People v. Raleigh* (1932) 128 Cal.App. 105, 108-109 . . . .)" (*People v. Page* (2004) 123 Cal.App.4th 1466, 1471 (*Page*); accord, *People v. McCoy* (1944) 25 Cal.2d 177, 188-189.)

"Because [the] definition [of deadly weapon] focuses on potentiality, the People need not prove an actual injury to a victim, or even physical contact between the defendant and a third person, in order to substantiate a conviction for assault with a deadly weapon other than a firearm. [Citation.]" (*In re D.T.* (2015) 237 Cal.App.4th 693, 698.) The question is whether the weapon was used in a way that was likely to cause significant or substantial injury. (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1087.) "Permanent or protracted impairment, disfigurement, or loss of function" need not have been the likely outcome of the assault. (*Ibid*.) Whether a defendant used a deadly weapon (or used deadly force, for that matter) ultimately "turns on the nature of the force used. . . . '[A]ll aggravated assaults are ultimately determined based on the force likely to be applied against a person.' [Citation.]" (*Aguilar*, *supra*, 16 Cal.4th at p. 1035.)

"'[A]n instrument can be a deadly weapon even if it is not actually used with deadly force.' (*People v. Page*, *supra*, 123 Cal.App.4th at p. 1472.) Consequently, multiple California courts have affirmed convictions under Penal Code section 245, subdivision (a)(1), when the deadly weapon used was 'some hard, sharp, pointy thing that was used only to threaten, and not actually used to stab.' (*Page*, at p. 1472.)" (*In re*

*D.T.*, *supra*, 237 Cal.App.4th at p. 699.) It is for the jury to decide the factual question of whether an instrument that is not inherently dangerous qualifies as a deadly weapon. (*People v. Moran* (1973) 33 Cal.App.3d 724, 730.)

Defendant swung or swiped the car key at Agustin's torso "with force." Agustin was standing within arm's reach of defendant, and defendant likely would have struck Agustin if Arthur had not pulled him back in time. The testimony was that Agustin was clothed and was wearing a polo shirt. But there was no testimony that Agustin was wearing anything under the shirt or that the shirt was tucked into his pants. And there is nothing in the record to suggest defendant would not have continued to swing the car key at Agustin if he and the other men had not backed off, or that defendant would only have swung at Agustin's torso and would not have swung for his face or neck. Defendant was agitated and angry, and he threatened to "fuck" the men up. On this record, a reasonable jury could conclude that defendant used the car key in such a way that it was capable of producing and likely to produce great bodily injury.

We believe this case is similar to *People v. Simons* (1996) 42 Cal.App.4th 1100 (*Simons*). The defendant in that case held several armed police officers at bay with a screwdriver, an object the court described as "not an inherently deadly weapon." (*Id.* at p. 1107.) Although instructed to drop the tool, the defendant flailed it about and urged the officers to shoot him. On those facts, the court found that for purposes of the crime of exhibiting a deadly weapon to prevent arrest (Pen. Code, § 417.8), "[t]he evidence clearly demonstrated that the screwdriver was capable of being used as a deadly weapon and that defendant intended to use it as such if the circumstances required." (*Simons*, at p. 1107.)

10

Like a screwdriver, a car key is not an inherently deadly weapon.  But if wielded with sufficient force, a screwdriver or car key can puncture skin and cause significant injuries.[3]

This is not the first time our court has relied on *Simons* when concluding a instrument that is not inherently deadly was used as a deadly weapon.  In *Page*, *supra*, 123 Cal.App.4th 1466, the defendant and his female accomplice robbed the victim and, after rifling the victim's pockets for his wallet, the female accomplice held a sharp pencil to the victim's neck and told him not to call the police.  (*Id*. at pp. 1468-1469.)  The defendant challenged his conviction for assault with a deadly weapon contending the pencil was not a deadly weapon.  (*Id*. at p. 1470.)  Relying on *Simons* and similar cases, this court concluded the accomplice used the pencil in such a manner that it was capable of producing serious bodily injury and, therefore, that under the facts of that case the

---

[3] There is no doubt that a key may be used as a defensive or offensive weapon. (See, e.g., *State v. Labrum* (Utah Ct.App. 2014) 318 P.3d 1151, 1153 [after defendant hit his wife, she "positioned the set of keys so that an individual key was protruding between each of her fingers"]; *Sharp v. Kelsey* (W.D.Mich. 1996) 918 F.Supp. 1115, 1119 [courtroom officer testified a belligerent attorney "came toward him clutching a set of keys in her fist with individual keys protruded from between her fingers like prongs, in a manner he had seen in self-defense classes"].)

An Internet website dedicated to women's self-defense advises that women hold a key "between your thumb and forefinger in order to use it like a short knife that you can use to cut an assailant's face," rather than "hold[ing] it between your fingers like an improvised knuckle duster."  According to this resource, "Most assaults happen at close range and you will probably not be given the room to make a solid, effective strike, whereas you will probably be able to get a hand to your attacker's face and be able to drag the key across their eyes, nose, cheek and throat etc. in a cutting action."  (See SEPS, Situation Effective Protection System for Women's Self-defense at <http://www.womensselfdefense-seps.com/womensselfdefense-course-module7.html> [as of July 17, 2018].)

11

pencil was a deadly weapon as a matter of law.  (*Id*. at pp. 1470-1473.)  We rejected the suggestion that *Simons* was distinguishable simply because it did not address the aggravated assault statute.  "'[N]o sound reason appears to define a "deadly weapon" for purposes of [Penal Code] section 245 differently than it is defined in other contexts under other statutes.'  [Citations.]  Cases discussing the definition of a deadly weapon routinely rely on other cases dealing with different statutes.  [Citations.]"  (*Page*, at p. 1472.)

More recently, *In re D.T.*, *supra*, 237 Cal.App.4th 693, the juvenile court found that a minor committed an assault with a deadly weapon when he poked a classmate in the back with the sharp end of a pocketknife.  The victim testified, "[t]he knife felt 'sharp' and 'pointy,' and [she] felt some pain.  She did not think minor would hurt her, or that he was trying to cut or kill her.  However, the victim was scared that an injury might occur because minor had a knife pressed to her back."  (*Id.* at p. 697.)  The investigating officer testified that similar knives can cause serious injury or death.  (*Ibid*.)

On appeal, the minor in *In re D.T.*, *supra*, 237 Cal.App.4th 693, argued that the knife was not likely to cause death or great bodily injury.  Relying on our decision in *Page* and on *Simons*, we disagreed.  "[I]n *Page* this court found a pencil, which is less sharp and less likely to cause serious harm than a knife, to be a deadly weapon when it was held against a victim's throat without any slicing or stabbing motions.  (*People v. Page*, *supra*, 123 Cal.App.4th at p. 1472.)  Even more supportive of our point is *People v. Simons* (1996) 42 Cal.App.4th 1100, 1106-1107 . . . , in which the court held that a screwdriver was a deadly weapon even though the defendant had only brandished it at police officers without actually touching anyone.  If a pencil held to a victim's neck, *and*

12

*a screwdriver that is only used to threaten from a distance*, are both likely to cause death or serious bodily injury, then so is a sharp knife held to the back of a victim. As we have explained, the test is whether the knife was '"used in such a manner as to be *capable of producing* and *likely to produce*, death or great bodily injury." [Citation.]' (*Aguilar, supra*, 16 Cal.4th at pp. 1028-1029, italics added.) Because the knife was sharp, and because minor held it against the victim in such a way that a sudden distraction or misstep could have resulted in a serious puncture wound, the knife had the capacity to cause serious bodily injury or death. It therefore meets the *Aguilar* standard for likelihood."[4] (*In re D.T.*, at pp. 700-701, first italics added, second italics in original.)

As in *Page* and *In re D.T.*, we continue to find *Simons* persuasive. If using a screwdriver to fend off police officers from a distance is an assault with a deadly weapon, then forcefully swinging or swiping a car key from a short distance is also an assault with a deadly weapon.

---

[4] To be sure, the pocket knife used by the minor in *In re D.T.* is different than a car key because, by definition, a pocket knife has a pointed blade that is designed to cut.

The court in *In re Brandon T.* (2011) 191 Cal.App.4th 1491 held that a butter knife "with a rounded end and slight serrations on one side" was not used as a deadly weapon when the minor tried to cut the victim by slashing his neck, but failed because the blade broke. (*Id.* at pp. 1496-1498.) To the extent that decision suggests that a key or similar instrument is not capable of being used as a deadly weapon simply because it lacks a knife-life "pointed" end, we respectfully decline to follow it. More recently, the court in *In re B.M.* (2017) 10 Cal.App.5th 1292 expressly disagreed with *In re Brandon T.* and held that a butter knife with small ridges on one end *is* capable of being used as a deadly weapon. (*In re B.M.*, at pp. 1298-1300, review granted July 26, 2017, S242153.)

B.      *The Trial Court Must Determine on Resentencing Whether to Impose Concurrent Sentences on Counts 1 and 3.*

Defendant contends, and we agree, that the trial court inaccurately believed it could only sentence defendant on counts 1 and 3 concurrently with the sentence on count 2 if it first struck defendant's strike. We reverse the sentence and remand for the trial court to consider in the first instance whether concurrent sentences on counts 1 and 3 are appropriate.

At sentencing, defense counsel asked the trial court to sentence defendant to nine years on count 2 (the low term of two years, doubled under the one strike law, plus a five-year enhancement for the prior serious felony conviction). Counsel also requested that the court consider imposing concurrent sentences for counts 1 and 3: "We would obviously greatly appreciate it if the Court would run the time concurrent on the other two counts but should the Court be inclined not to run that concurrent that it run one-third the midterm for two years on Count 1." The court indicated its belief that, for the sentences on counts 1 and 3 to run concurrently with count 2, "I'd have to strike the strike for those counts." Counsel stated she was not asking the court to strike the strike. The court then stated, "I think it has to be consecutive unless I strike the strike. I can do that for those subsequent counts[, i.e., counts 1 and 3], impose it one time [on count 1] then strike it."

The trial court designated count 2 as the principal count, and sentenced defendant to the middle term of three years, doubled pursuant to the one strike law, for a term of six

14

years in state prison.  On count 1, the trial court sentenced defendant to one-third the middle term of three years.  But rather than strike the strike conviction, the court doubled the term pursuant to the one strike law for a term of two years in state prison to run consecutively to count 2.  Similarly, the trial court sentenced defendant to one-third the middle term of two years on count 3, doubled pursuant to the one strike law, for a term of one year four months in state prison to be served consecutively to count 2.  Finally, the trial court imposed a five-year sentence enhancement for defendant's prior serious felony conviction, to be served consecutively to count 2, for a total term of 14 years four months in state prison.

"If there is a current conviction for more than one felony count *not committed on the same occasion, and not arising from the same set of operative facts*, the court *shall* sentence the defendant consecutively on each count . . . ."  (Pen. Code, §§ 667, subd. (c)(6), 1170.12, subd. (a)(6), italics added.)  Under the plain language of the statutes, the trial court has no discretion to sentence a defendant to concurrent sentences under the three strikes law when the current felony convictions were committed on the same occasion and arose from the same operative facts.  In that situation, consecutive sentences are mandatory.  (*People v. Hojnowski* (2014) 228 Cal.App.4th 794, 800.)  But the trial court has discretion to impose concurrent sentences if it concludes the current convictions were *not* committed on the same occasion and did *not* arise from the same operative facts (*People v. Casper* (2004) 33 Cal.4th 38, 42), unless a consecutive sentence is otherwise mandated by another statute (*People v. Torres* (2018) 23 Cal.App.5th 185, 198).

As noted, the trial court indicated it believed it could impose concurrent sentences on counts 1 and 3 only if it first struck defendant's strike conviction. The People contend the record does not affirmatively demonstrate that the trial court misunderstood its limited discretion to impose concurrent sentences under the three strikes law, and that the court's "vague statement" does not overcome the presumption that the court understood its discretion. The trial court was not vague in the least. To repeat, when defense counsel asked for the court to impose consecutive sentences on counts 1 and 3, the court said, "*I'd have to strike the strike for those counts*." (Italics added.) The court also said, "I think it has to be consecutive *unless I strike the strike*. I can do that for those subsequent counts[, i.e., counts 1 and 3], impose it one time [on count 1] then strike it." (Italics added.) On this record, we are not persuaded that the trial court understood it had discretion to impose concurrent sentences. "[W]hen the record indicates the court misunderstood or was unaware of the scope of its discretionary powers, we should remand to allow the court to properly exercise its discretion. [Citations.]" (*People v. Bolian* (2014) 231 Cal.App.4th 1415, 1421.)

The People also argue that, if we conclude the trial court misunderstood its discretion, we should not remand for resentencing because there is no possibility the trial court will conclude the offenses were not committed on the same occasion or did not arise out of the same operative facts. According to the People, the record supports the trial court's implied findings that the current offenses were all committed on the same occasion and arose from the same operative facts.

16

We might be inclined to apply the doctrine of implied findings but for the fact that the trial court sentenced defendant under the clear misapprehension that striking a strike was the only way to impose a concurrent sentence, and there is no indication whatsoever that the court impliedly concluded that the crimes were not committed on the same occasion and did not arise from the same operative facts. Although we agree with the People that arguably defendant's offenses of robbery and resisting arrest were not committed on the same occasion and did not arise from the same set of operative facts, it is a much closer call with respect to his offenses of robbery and assault with a deadly weapon. Such a determination is much better left to the trial court in the first instance.

C.      *Errors in the Minute Order from Sentencing and Abstract of Judgment.*

Defendant argues, and the People agree, there is an error in the minute order from the sentencing hearing regarding his prior felony admission. The People originally alleged defendant had suffered two prior felony convictions: a 2013 conviction for possession of a controlled substance and a 2011 strike conviction for attempted carjacking. At the sentencing hearing, however, the prosecution pursued only the prior conviction for carjacking after agreeing with defense counsel that the drug conviction was likely to be reduced to a misdemeanor under Proposition 47. Defendant then waived his right to a jury trial and admitted the attempted carjacking conviction. However, the minute order erroneously states, "Defendant admits Prior(s) 01 [and] 02," and "Court orders Prior(s) 02 Stricken."

Defendant also contends the minute order and abstract of judgment do not reflect the oral pronouncement of the restitution fine and parole revocation fine. Penal Code

17

section 1202.4 mandates that every defendant convicted of a felony be ordered to pay a restitution fine of no less than $300 and no more than $10,000. (Pen. Code, § 1202.4, subd. (b)(1).) The court may, in its discretion, impose a restitution fine using the following formula: the minimum fine ($300), times the "number of years of imprisonment the defendant is ordered to serve," times "the number of felony counts of which the defendant is convicted." (*Id.*, subd. (b)(2).) The court must also impose a parole revocation fine in the same amount as the restitution fine. (Pen. Code, § 1202.45, subd. (a).)

In its report and sentencing recommendation, the probation department recommended the trial court consider count 2 as the principal count and sentence defendant as follows: the middle term of three years on count 2, doubled under the one strike law should the prior strike be found true; one-third the middle term of three years on count 1, doubled if the court found true the strike allegation; and one-third the middle term of two years on count 3, again, doubled should the court find true the strike allegation. Therefore, the probation department recommended a total state prison sentence of four years eight months if the strike prior was not found true and a sentence of 15 years four months if it was found true (this included the five-year enhancement for the strike prior, and a one-year enhancement for a prison prior that defendant did not admit). Based on the minimum recommended prison sentence of four years eight months (assuming the strike prior was not found true), the probation department recommended the trial court impose restitution and parole revocation fines in the amount of $3,600

18

each, using the formula set forth in Penal Code section 1202.4, subdivision (b)(1) (minimum fine ($300) x years in prison (4) x number of convictions (3) = $3,600).

With the exception of the one-year enhancement for the alleged prison prior, that defendant did not admit, the trial court followed the probation department's recommendation for sentencing. It did not, however, impose the recommended restitution and parole revocation fines. The court plainly stated on the record, "I shall impose a minimum restitution fine and other fines." Yet, the minutes from sentencing and the abstract of judgment both indicate defendant was ordered to pay a restitution fine of $3,600 and a parole revocation fine of $3,600. This was plainly in error. As noted, the minimum restitution and parole revocation fine is $300. (Pen. Code, §§ 1202.4, subd. (b)(1), 1202.45, subd. (a).)

The People argue the minutes and abstract of judgment reflect the correct restitution and parole revocation fines as permitted by Penal Code section 1202.4, subdivision (b)(2). But, the People's argument presupposes that the trial court intended to impose a fine using that formula. Nothing supports that conclusion. The trial court said, clearly and unambiguously, it was imposing the "*minimum* restitution fine and other fines." (Italics added.) There is no wiggle room there.

Moreover, arithmetic is not on the People's side. The probation department recommended a restitution and parole revocation fine of $3,600 based on the assumption that defendant's strike prior would not be found true, and that defendant would only be sentenced to four years eight months. Had the trial court intended to impose restitution and parole revocation fines using the formula set forth in Penal Code section 1202.4,

19

subdivision (b)(2), the correct figure would have been $10,000 (minimum fine ($300) x years of imprisonment (14) x number of convictions (3) = $12,600, capped at the maximum fine of $10,000).

Because we reverse the sentence and remand for resentencing, we need not direct that the minutes and abstract of judgment be corrected. When defendant is resentenced, we presume the minutes will accurately reflect that defendant only admitted one strike prior. The trial court is, of course, free at resentencing to impose a new restitution and parole revocation fine. Should the court once more impose the minimum fines, we presume the minutes of sentencing and abstract of judgment will so reflect.

IV.

DISPOSITION

The sentence is reversed. At resentencing, the trial court must consider whether concurrent sentences on counts 1 and 3 are appropriate pursuant to Penal Code sections 667, subdivision (c)(6), and 1170.12, subdivision (a)(6).

In all other respects, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

McKINSTER
Acting P. J.

I concur:


MILLER
J.

20

Slough, J., Dissenting.

I

INTRODUCTION

I respectfully disagree with my colleagues' conclusion that swiping a car key once with unknown force at a person's clothed torso from a few feet away, then fleeing, constitutes assault with a deadly weapon. The majority reaches this outlier holding only by leaving the record and engaging in gross speculation—they affirm the conviction based on what *could have happened* had the defendant, Brian Koback, not fled but instead continued swiping the key at the victim and perhaps, possibly, aimed for his face or neck. This is error. Where the charged offense is assault with a typically innocuous object alleged to be deadly *as used* (an as-used aggravated assault), California Supreme Court precedent requires the prosecution prove the defendant used the object with force "*likely to produce* death or great bodily injury" (the force-used test). (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1029, italics added (*Aguilar*).)

The only evidence regarding the force used in this case is the victim's testimony Koback swiped the key at him from a few feet away "with force" then immediately left the scene. How much force? Enough to gravely injure the victim? Enough only to scratch or graze him? The record doesn't provide an answer, and it is obvious that *some* force is not the same as force *likely to produce* death or great bodily injury. (See *People v. Beasley* (2003) 105 Cal.App.4th 1078, 1087 (*Beasley*) [reversing conviction under

1

*Aguilar* because the victim's testimony "did not describe the degree of force Beasley used in hitting her with the [broom]stick"].)

The majority pays lip service to *Aguilar's* force-used test by citing it in their analysis, but they don't actually apply it. Instead, they rely on an opinion involving the offense of exhibiting a deadly weapon to evade arrest in violation of Penal Code section 417.8. (*People v. Simons* (1996) 42 Cal.App.4th 1100 (*Simons*).) But because that crime does not "turn[] on the nature of the force used" (*Aguilar*, *supra*, 16 Cal.4th at p. 1035) like an as-used aggravated assault does, it provides no support for their holding. *Aguilar* is binding California Supreme Court precedent we are required to follow. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456.) The majority cannot escape this duty by applying a different test from a nonbinding lower court opinion that predates *Aguilar*.

The majority's error is not harmless. By upholding an as-used aggravated assault conviction based on a key's *capacity* to inflict injury and their conjecture about what *might* have happened had things gone differently, my colleagues blur the important distinction between cases involving *inherently* deadly weapons and those involving objects alleged to be deadly *as used*. In this case, the blurring leads them to affirm a bad aggravated assault conviction. As precedent, it will lead to over-prosecution of simple assaults, treating people who use innocuous objects without injury as if they are just as culpable as people who wield weapons designed to inflict deadly injury. It is critical that

2

we maintain the distinction, for a fool with a car key is much less dangerous than a fool with a dagger.

## II

## DISCUSSION

A.     *Assault with an "Inherently" Deadly Weapon Versus Assault with an Object Deadly "As Used"*

Assault is an attempted battery. (*People v. Rocha* (1971) 3 Cal.3d 893, 899.) The Penal Code defines it as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code, § 240; see also *id.* at § 242 [battery is "any willful and unlawful use of force or violence upon the person of another"].)

The more serious crime of *aggravated* assault in violation of Penal Code section 245 can be committed in a number of ways. Three types of aggravated assault are relevant here: (1) by means of force likely to produce great bodily injury, (2) by means of an *inherently* deadly weapon, and (3) by means of an object not designed to be a weapon but alleged to be a deadly weapon *as used*. The first and third type require a showing of the amount of force the defendant used during the assault. "[T]he jury's decisionmaking process in an aggravated assault case . . . is functionally identical regardless of whether, in the particular case, the defendant employed a weapon alleged to be deadly *as used* or employed force likely to produce great bodily injury; *in either instance, the decision turns on the nature of the force [the defendant] used*." (*Aguilar*, *supra*, 16 Cal.4th at p. 1035, italics added.) Only the second variety, assault with an

3

inherently deadly weapon, requires no showing of force.  Merely using the weapon to attempt an injury is enough.

A deadly weapon is any object specifically designed to produce death or great bodily injury.  (*Aguilar*, *supra*, 16 Cal.4th at p. 1029.)  "Only [s]ome few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such." (*Ibid.*)  A person commits assault with a deadly weapon in violation of Penal Code section 245, subdivision (a)(1) when they employ a deadly weapon in their attempt to injure someone. One may assault another with a deadly weapon "without making actual physical contact." (*Aguilar*, at p. 1028.)  "[T]he statute focuses on *use* of a deadly weapon," not on contact or injury.  (*Ibid.*)

Thus, one can commit assault with an inherently deadly weapon simply by *threatening* injury on another, such as by holding a dagger or blackjack close to someone in a menacing manner or by swinging at them, and missing.  It wouldn't matter how hard you swung or how close you got to your target.  The fact you *used* an inherently deadly weapon in your *attempt* to injure someone is enough to warrant the conviction.  (See, e.g., *Simons*, *supra*, 42 Cal.App.4th 1100 ["Assault with a deadly weapon requires 'an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another'"]; *People v. McCoy* (1944) 25 Cal.2d 177, 190-191 [simply holding a knife up to victim's face and threatening to use it constituted aggravated assault because the knife was inherently dangerous and defendant exhibited a *present ability* and *intent* to use

4

it if need be].)  This is so precisely because the weapon is designed to be deadly, making the risk of injury from any use of the weapon to attempt an injury dire.

What happens, then, if the object used in the assault is not *designed* to be a weapon?  The California Supreme Court addressed this issue in *Aguilar*, observing that "[some] objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury."  (*Aguilar*, *supra*, 16 Cal.4th at p. 1029.)  The test for whether a typically innocuous everyday object has been used as a deadly weapon in an assault is whether it was "used in such a manner as to be capable of producing *and likely to produce*, death or great bodily injury."  (*Id*. at pp. 1028-1029, italics added.)  The first part of the test, capability, focuses on the nature of the object (is it sharp, heavy, blunt?) and whether it is *possible* to cause serious injury with it.  Some objects will fail even this inquiry.  It is probably impossible to kill or gravely injure someone with a rice cake, whereas we can all imagine how a person could do serious damage with a butter knife or a golf club.

The second part of the test, likelihood, focuses on how the defendant *actually* used the object.  This inquiry "turns on the nature of the force used."  (*Aguilar*, *supra*, 16 Cal.4th at p. 1035)  Objects that can "be grasped while throwing a punch, like rolls of coins, batteries, . . . bicycle footrests," (or car keys), may "be deemed instruments of [aggravated] assault" *only if* there is "sufficient proof" the object was actually used "in a manner *likely to produce* death or great bodily injury."  (*In re David V*. (2010) 48 Cal.4th 23, 30 & fn. 5, quoting *Aguilar*, at p. 1029, italics added.)  In other words, the capability

5

prong turns on how someone *could* use the object to injure and can therefore be based on speculation.  By contrast, the likelihood prong depends on how *the defendant did* use the object and therefore must be based on evidence in the record.  It is the difference, for example, of swinging a nine iron at someone's head, or shoving someone in the shoulder with it.  The club is certainly capable of causing severe injury, but only in the former example is it also likely to cause severe injury *as used*.

The added likelihood inquiry for everyday objects makes sense.  While "all aggravated assaults are ultimately determined based on the *force likely to be applied* against a person" (*Aguilar*, *supra*, 16 Cal.4th at p. 1035, italics added), we infer or assume a likelihood of great bodily injury in the case of inherently dangerous weapons because they are specifically designed to inflict such injury.  In other words, the *mere use* of a deadly weapon while attempting to injure someone is sufficient to constitute aggravated assault.  The same is not true, however, for golf clubs, car keys, and other generally innocuous objects.  For these, we must look to the specifics to determine whether the defendant's actions were culpable enough to warrant the harsher punishment aggravated assault carries.  That additional, factual analysis is clear cut:  Was the force with which the defendant used the object *likely to produce* death or great bodily injury? (*Ibid.*)

      B.    *The Record Contains No Evidence of Force "Likely to Produce" Great Bodily Injury*

Regarding the first prong of the *Aguilar* test, a car key is unquestionably *capable of* producing great bodily injury, for example, if you use the pointed part to repeatedly

6

pummel someone or stab at a vulnerable part of their body. Yet the majority spends most of their analysis on this completely obvious and uncontested point. They even survey out-of-state case law and self-defense websites to make it. (Maj. opn., *ante*, at p. 11, fn. 3.) The result does not repay the effort. We're left where we started, knowing a car key *could* produce great bodily injury, but not knowing anything about how *this* defendant used *this* key.

The only question we have to answer on appeal is whether Koback actually used the key with force likely to produce death or great bodily injury. Here is the sum total of what we know about the key and the swing from trial. The key is one of the modern, electronic car keys, consisting of a round plastic fob and a wide metal shaft. The shaft is two inches long and tapers slightly to a rounded point. Unlike the older versions of car keys that tend to have sharp, jagged cuts, this key's cuts are smooth.[5] The victim and his two coworkers testified Koback stood between three and five feet away from them when he made a fist around the plastic fob so the shaft protruded from his knuckles. The victim said Koback then swiped "with force" at his torso. One of the coworkers described the motion "Pretty much as if [Koback] was throwing a punch." The swipe did not land— either because Koback was too far away or because one of the coworkers pulled the victim away in time. The victim said Koback "got scared and he left" immediately after swiping at him.

---

[5] We reviewed the photograph of the key the prosecution submitted to the jury.

This evidence is even less meaningful than the testimony regarding force in *Beasley*, which the court determined was "far too cursory" to satisfy the likelihood or force-used test under *Aguilar*. (*Beasley*, *supra*, 105 Cal.App.4th at p. 1087.) At trial, the victim testified the defendant had used the broomstick to "beat me like he never beat me before," and the prosecution submitted photographs of her bruised arms and shoulders to illustrate the extent of her injuries. (*Ibid.*) The court concluded that evidence was insufficient under *Aguilar* because the defendant had struck only non-vulnerable parts of the victim's body (her arms and shoulders) and because her testimony "did not describe the degree of force [he had] used in hitting her with the stick." (*Ibid*.) "The jury therefore had before it no facts from which it could assess the *severity* of the impact between the stick and [the victim's] body. . . . [The] bruises on [her] shoulders and arms are insufficient to show [he] used the broomstick as a deadly weapon." (*Id.* at p. 1088, italics added.) In other words, without evidence about the *degree of force* used or evidence the defendant had targeted more vulnerable parts of the victim's body, such as her "head or face," the bruises, on their own, did not give the jury a basis to find the defendant had used the broomstick in a manner *likely to produce* death or grave injury. (*Id.* at p. 1087.)

The same is true here. The record is silent on the amount of force involved in the swipe because the victim did not describe it in sufficient—or any—detail. Moreover, unlike in *Beasley*, Koback's conduct did not result in physical contact, so we cannot try to discern the amount of force from evidence of the impact. (See, e.g., *People v. Brown*

8

(2012) 210 Cal.App.4th 1, 7 [the "nature" and "location" of injuries "are relevant facts for consideration in determining whether an object *was used* in a manner capable of producing *and likely to produce* great bodily injury"], italics added.)

The majority simply ignores *Beasley* as inconvenient precedent, when it should explain why its holding is not dispositive of our case. Instead, they attempt to supply the missing evidence of force through hypothetical, arguing: "[T]here is nothing in the record to suggest defendant would not have continued to swing the car key at [the victim] if he and the other men had not backed off, or that defendant would only have swung at [the victim's] torso and would not have swung for his face or neck." (Maj. opn., *ante*, at p. 10.) This speculation is completely irrelevant to the likelihood, or force-used, analysis. It demonstrates only that a key *can* be used to injure. If it were permissible to make up stories about how the object was used, the court would have done so in *Beasley*, upholding the conviction by reasoning there was "nothing in the record to suggest defendant would not have" continued to beat the victim with the broomstick and, say, poked her in the eye with it.

Perhaps more important—and surely more egregious—the majority's speculation that "there is nothing in the record to suggest" Koback would not have swung more times misstates the evidence. The victim said Koback "got scared" after swiping at him and immediately fled. That testimony not only suggests but establishes that Koback would not have stuck around and launched a full scale attack on the employees. Moreover, contrary to what the majority's violent and overblown hypothetical suggests, the fact he

9

fled strongly suggests he was *not* trying to gravely injure the victim by swiping at him. It is much more likely he was trying only to gain distance from his pursuers—like he had a few minutes earlier in the Enterprise parking lot by threatening to "fuck [them] up" if they didn't back away. Notably, Koback also fled during that first encounter.

The majority tries to sidestep the lack of evidence of force by evoking an aura of dangerousness around the event. They recount the details of the employees' first encounter with Koback in the Enterprise parking lot in great and unnecessary detail, noting how close he stood to them, how he told them he'd "fuck [them] up" if they didn't back off, and how he seemed to be getting "angry and agitated." (Maj. opn., *ante*, at pp. 5-6.) None of these facts matters to the issue actually in dispute—whether he swung the key with force likely to produce great bodily injury during the *second*, later encounter in the motel parking lot. While his actions during the first encounter may provide circumstantial evidence of his state of mind during the second, his state of mind is not in dispute. It is uncontested he *intended* to assault the victim. The issue is whether that assault was simple or aggravated, based on the force he used in wielding the key. (*Aguilar*, *supra*, 16 Cal.4th at p. 1035.)

"[T]he crime of assault has always focused on *the nature of the act* and not on the perpetrator's specific intent." (*People v. Williams* (2001) 26 Cal.4th 779, 786, italics added.) Thus, even if the jury could reasonably infer that, in his own mind, Koback had very much wanted to hurt the victim with his single swing, that doesn't change the fact the jury had no idea what kind of force was behind his single motion. Whether Koback

10

was enraged or simply scared and desperate is immaterial because it doesn't tell us whether he swiped at the victim like Bruce Lee or a drunk. And the amount of force makes all the difference because Koback fled immediately after his single swipe and, as the photograph of the key shows, it is not sharp or jagged enough to cut skin *with a single swipe* unless wielded with extreme force. (Cf. *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 541 [sufficient evidence to support finding pellet gun held to victim's head was capable of causing serious injury where expert testimony established it could "expel pellets at speeds in excess of those required to penetrate a significant distance into muscle tissue or to enter an eyeball"].) In other words, the jury may have had evidence of intent, but it did not have sufficient evidence of *the nature of the act* to convict Koback of aggravated assault.

It should go without saying an appellate court may not fabricate the evidence to support a conviction when conducting a substantial evidence review. But that appears to be precisely what my colleagues are doing with their conjecture about what might have happened had Koback continued swinging. The majority also muses that we have no idea whether the victim's shirt was tucked in or whether he might have been wearing a *second* shirt underneath his company's polo shirt. (Maj. opn., *ante*, at p. 10.) True, there are many things we do not know about this incident, and anything is possible in a hypothetical. It's also possible Koback could have gravely injured the victim if he had shoved the key in his ear. But in reality, Koback did none of the things the majority mentions. He swung once at the victim's torso *with unknown force*, and fled. Whether

11

he missed because he was too far away or because the victim was pulled aside is immaterial. So is whether the victim was wearing an extra layer of clothing. Answering those questions would shed no light on the forcefulness of the swipe.

I recognize that in cases like this, where the defendant does not make contact with the victim during the assault, some form of speculation about what might have (but didn't) happen is required to determine whether the defendant used force "likely to produce" great bodily harm under *Aguilar*. (*Aguilar*, *supra*, 16 Cal.4th at p. 1029.) However, courts should limit their speculation to identifying the risk of injury posed by the defendant's actual conduct. They should not engage in speculation about what *additional* actions the defendant *could have taken* that would have increased the risk of injury.

*In re D.T.* (2015) 237 Cal.App.4th 693 provides an example of appropriate speculation under *Aguilar's* likelihood test. In that case, a different panel of this court held the defendant's act of pressing the blade of a pocketknife into his classmate's back in the school hallway constituted force likely to produce great bodily injury. (*In re D.T.*, at p. 701.) They reached this conclusion by applying a risk analysis supported by evidence in the record. At trial, the investigating officer had testified she had seen similar knives cause severe and even fatal wounds and the victim had a red mark on her back from how hard the minor was pressing the knife to her.[1] (*Id.* at p. 697.) Based on

---

[1] Arguably, the defendant in *In re D.T.* was guilty of assault with an inherently dangerous weapon, as the pocketknife was specifically designed to be sharp enough to

*[footnote continued on next page]*

this evidence, the court concluded it was probable that "a sudden distraction or misstep" would have "resulted in a serious puncture wound" to the victim's back. (*Id.* at p. 701.) This speculation was both limited to the risk of injury from the defendant's actions and supported by testimony about the nature of the object. In contrast, my colleagues' speculation is not limited to Koback's conduct—they have to dream up additional things he could have done to be able to identify a risk of injury. This is improper speculation because it is not grounded in the record. Simply put, it is appropriate to speculate about *hypothetical* injuries from *real* actions (*In re D.T.*), but it is completely improper to speculate about hypothetical injuries from *hypothetical* actions, as the majority does here.

C.      *Simons Is Inapplicable*

To uphold the conviction, the majority relies heavily on *Simons*, *supra*, 42 Cal.App.4th 1100, a pre-*Aguilar* case that involves the distinct offense of exhibiting a deadly weapon to evade arrest. (Pen. Code, § 417.8.) A person commits that offense by *brandishing* a dangerous object at a police officer with the intent "to use it as a weapon should the circumstances require." (*Simons*, at p. 1107.) In *Simons*, the defendant waived a screwdriver at a group of police officers in a menacing way while ordering them to "stay back," then threatened to stab the police dog with the screwdriver if they didn't go away. (*Id.* at p. 1106.) Only after throwing a chair at the defendant and "a brief

---

[footnote continued from previous page]
[footnote continued from previous page]
cut through materials more resilient than skin, but the court treated the offense as an as-used aggravated assault.

13

struggle" were the officers able to disarm him. (*Ibid.*) The *Simons* court upheld the Penal Code section 417.8 conviction, concluding that a screwdriver was dangerous (if used to slash or stab) and the evidence amply supported a finding the defendant *intended* to use it as a weapon to keep the officers and police dog at bay.

The majority concludes *Simons* is dispositive of our case, reasoning, "[i]f using a screwdriver to fend off police officers from a distance is an assault with a deadly weapon, then forcefully swinging or swiping a car key from a short distance is *also* an assault with a deadly weapon." (Maj. opn., *ante*, at p. 13.) First of all, the majority seems to have missed or forgotten that *Simons* is not an aggravated assault case, but putting that mischaracterization aside, their comparison is still inapt. What matters in a Penal Code section 417.8 case is the defendant's *intent*—that is, whether he or she brandished a dangerous object at a police officer as a means of evading arrest. In other words, Penal Code section 417.8 is concerned with protecting police officers from injury when making arrests and, as a result, punishes those who would exhibit a dangerous object during an arrest with the intent to use it if need be. As-used aggravated assaults, by contrast, depend *entirely* on the type of force used. A person is guilty of as-used aggravated assault only if they wield the typically innocuous object "in a manner likely to" cause serious harm. (*Aguilar*, *supra*, 16 Cal.4th at p. 1029.) *Simons* therefore has no bearing on an as-used assault case like this one. The test we must apply is the one in *Aguilar*.

The source of the majority's mistake in relying on *Simons* appears to be *People v. Page* (2004) 123 Cal.App.4th 1466 (*Page*). In that case, a different panel of our court

concluded the defendant committed as-used aggravated assault when she held the sharpened tip of a pencil to the victim's neck during a robbery and told him not to involve the police because she "knew where he lived." (*Id.* at p. 1469.) Like the majority does here, the *Page* court cites the two-part *Aguilar* test, but then applies the *Simons* test. The court upheld the aggravated assault conviction on the ground a sharpened pencil could be dangerous and the defendant's use of the pencil while threatening the victim during a robbery demonstrated she *intended* to use it as a weapon *if need be*. (*Page*, at p. 1473.)

As just explained, because exhibiting a deadly weapon to evade arrest does not require the use of force likely to inflict great bodily harm, the *Simons* test does not apply to as-used aggravated assaults. However, unlike here, the *Page* court's incorrect analysis did not result in an improper conviction. Had the court applied the *Aguilar* test instead of the *Simons* test, it could have properly concluded, like the court did in *In re D.T.*, that "a sudden distraction or misstep" likely would have "resulted in a serious puncture wound" to the victim's neck. In other words, it would have been reasonable for *Page* to conclude that grave injury is likely when one holds a sharp object to a vulnerable part of the body during a tense encounter like a robbery, when things can take a wrong turn at any given moment. Here, in contrast, we cannot say with any confidence that Koback's swinging motion threatened a similar risk of serious injury.

What our case boils down to is a single swipe of a car key at a person's clothed torso from a few feet away with unknown force. No other court has upheld an

15

aggravated assault conviction on such scant evidence. A survey of the published cases where everyday items were found to have been used *in a manner likely to* kill or severely injure is illustrative of what an aberration this case is. In *People v. Russell* (1943) 59 Cal.App.2d 660, the defendant used a fingernail file to slash the victim's face, causing a large gash requiring 11 stitches. In *People v. White* (1963) 212 Cal.App.2d 464, the defendant bashed the victim's head with a rock, causing a two-inch gouge that penetrated "through all layers of the scalp . . . to the bone." (*Id.* at p. 465.) In *People v. Helms* (1966) 242 Cal.App.2d 476, the defendant smothered the victim's face with a pillow "for several minutes." (*Id.* at p. 478.) In *People v. Richardson* (1959) 176 Cal.App.2d 238, the defendant repeatedly slashed the victim's face and head with a razor blade, causing cuts that required 25 to 30 sutures. In *People v. Lee* (1937) 23 Cal.App.2d 168, the defendant hit the victim "several times over the head" with a pipe. (*Id.* at p. 169.)

I realize comparison to cases with stronger facts can be of limited value in a substantial evidence review, however I believe these cases demonstrate what constitutes sufficient evidence of force in cases of aggravated assault *with everyday objects*. In each, the object was actually used in a manner likely to produce great bodily injury. And in most, the victims sustained injuries. Given Koback swung once at the victim's clothed torso, he would have had to use quite a great deal of force to produce death or great bodily injury with the key, and the trial testimony is simply insufficient to show he did.

I have found only one case where the everyday item held to have been used as a deadly weapon *never made contact with the victim*, and that case is easily distinguishable.

16

In *In re Jose R.* (1982) 137 Cal.App.3d 269, the defendant stuck a metal pin inside an apple and gave it to his teacher, but fortunately another student warned the teacher before she could eat it. (*Id.* at p. 274.) At trial, a medical expert testified about the severe injuries and infections that could have resulted from ingesting that particular pin. She also opined ingestion could have been fatal. (*Id.* at p. 276.) Based on that evidence, the court held the defendant had used the pin as a deadly weapon because, had the teacher ingested it as planned, she would have suffered grave injury. (*Ibid.*) Here, in contrast, the record contains no testimony about what could have happened had Koback's swing landed. Unlike ingesting a metal pin, which is sharp enough to draw blood upon slight contact, the type of the injury, if any, that would result from being hit in the midsection with a car key like Koback used depends *entirely* on the force behind the swing.

III

CONCLUSION

I cannot join an opinion that relies on inapplicable case law and hypothesizes factual scenarios not supported by the record to reach its result. Koback did not continue swiping the key at the victim and did not aim for his face or neck. He swung once at his torso from a few feet away. Because the record contains no evidence he did so with force "likely to produce" death or great bodily injury, he should not be guilty of assault with a deadly weapon. There is, however, sufficient evidence he committed the lesser included offense of simple assault, so I would reduce his conviction to that offense. (*Beasley*, *supra*, 105 Cal.App.4th at p. 1088.)

17